KOONS, WILSON & CO. *v.* UNITED STATES (No. 1859).[1]

1. EVIDENCE, SUFFICIENCY OF.

The undisputed testimony of a competent, undiscredited witness, corroborated by the duly admitted deposition of another, that certain clays were used for making pots in which glass was melted and that they were typical glass-pot clays is sufficient to establish that as a fact in the case.

2. CONSTRUCTION, PARAGRAPHS 534 AND 450, TARIFF ACTS OF 1909 AND 1913— "COMMON BLUE CLAY * * * SUITABLE FOR THE MANUFACTURE OF GLASS MELTING POTS."

Clay shown to be as blue as any used in the manufacture of glass melting pots answers the call of the word "blue," in the expression "common blue clay * * * suitable for the manufacture of glass melting pots" (pars. 534 and 450, tariff acts of 1909 and 1913), notwithstanding that it has a grayish tinge.

3. CONSTRUCTION, PARAGRAPHS 534 AND 450, TARIFF ACTS OF 1909 AND 1913— CHANGE IN LANGUAGE SIGNIFIES CHANGE IN MEANING—"CLAY * * * IN CASES OR CASKS."

In construing the provision "clay in casks," of the tariff act of 1897, the Board of United States General Appraisers held that it covered clay in bulk in any form, and that the style of the packing did not determine whether or not the clay was to be classified under the paragraph. Since this decision Congress, by paragraphs 534 and 450, tariff acts of 1909 and 1913, extended the expression to "clay * * * in *cases* or casks (italics ours). This makes manifest the fact that the attention of Congress was directed to the container when the act of 1909 was adopted, and that it then restricted the clay to be classified under the paragraph to that imported in cases or casks.

4. GLASS POT CLAY IN BAGS AND IN BARRELS OR CASKS.

Clay of a grayish tinge, shown to be used in making pots for melting glass and to be as blue as any used for that purpose, packed in barrels or casks, is admissible free of duty as "common blue clay * * * in cases or casks suitable for the manufacture of * * * glass melting pots" under paragraphs 534 and 450, tariff acts of 1909 and 1913. The same clay packed in bags is not admissible free of duty under the paragraphs, and was correctly classified as unwrought clay under paragraphs 90 and 76, tariff acts of 1909 and 1913.

---

[1] T. D. 37608 (34 Treas. Dec., 347).

United States Court of Customs Appeals, April 13, 1918.

APPEAL from Board of United States General Appraisers, G. A. 8069 (T. D. 37216).

[Reversed.]

*Comstock & Washburn* (*Albert H. Washburn* and *J. Stuart Tompkins* of counsel) for appellants.

*Bert Hanson*, Assistant Attorney General (*Thomas J. Doherty*, special attorney, of counsel), for the United States.

[Oral argument Dec. 6, 1917, by Mr. Washburn and Mr. Hanson.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

Three separate shipments of clay, one during the life of the act of 1909 and the other two since the act of 1913 took effect, were imported by the appellants. Those imported under the act of 1909 were assessed at the rate provided by that act for unwrought clays and those imported under the act of 1913 were assessed under a like provision of that act. The paragraphs under which the assessments were made are substantially similar except as to the rate of duty, and we quote paragraph 90 of the act of 1909 as follows:

90. Clays or earths, unwrought or unmanufactured, not specially provided for in this section, $1 per ton; wrought or manufactured, not specially provided for in this section, $2 per ton; * * *.

The importers protested that the importations were entitled to free entry under the free-list provisions of the several acts in force at the date of importation. These provisions being identical, we quote from the act of 1909:

534. Clay: Common blue clay and Gross-Almerode glass-pot clay, in cases or casks, suitable for the manufacture of crucibles and glass melting pots or tank blocks.

The Board of General Appraisers overruled the protest and the importers appeal.

· The question presented is whether the clay represented by the samples is common blue clay suitable for use in the manufacture of crucibles and glass pots. It seems to be taken for granted that glass pots are a form of crucibles, and if it is shown that these are suitable for glass pots, it would follow that they are suitable for a form of crucibles, and within the terms of the statute.

The testimony would apparently indicate that the clays introduced are suitable for the purpose of making glass pots. The board appeared to be of the opinion that the case in this respect had not been made out, on the ground that the uses which were shown to have been made were still experimental. We think the testimony, however, fairly shows that the clays are suitable for this use. The testimony upon this point is undisputed and only needs to be construed.

Mr. Kerr, a director of the research laboratory of the Pittsburgh Plate Glass Co., was called as a witness and in answer to the question, "Have you had any dealings in this clay, other than from a merely chemical standpoint?" testified, "The clay has been all bought and used under my supervision."

Q. Are you personally familiar with the use or uses to which clays like Exhibits 1, 2, and 3 are put?—A. I am; that has been a large part of my duty with the company.
Q. What are those uses?—A. The making of clay pots in which the glass is melted.
Q. Are these typical glass-pot clays?—A. They are.

Corroborative testimony to the same effect is given by Jules Delforge, of Belgium, taken by deposition.

It remains to be considered whether they are common blue clays within the meaning of that term as used in this statute. It is no easy matter to define common blue clay. The only definition to which attention has been directed appearing in the dictionaries is that which differentiates blue clay from other clays, given in the Dictionary of Chemicals and Raw Products, by George H. Hurst, published in 1901, which defines blue clay (p. 107) as "clay of grayish color which is much employed in the making of common pottery; it burns white or nearly white, and has the composition shown in the following analysis:" (Analysis follows.)

Mr. Kerr, in answer to the question, "Do you know of any clays that are used or are suitable for use in the manufacture of crucibles and glass melting pots or tank blocks that have any more bluish tinge than these samples which you produce?" testified, "I know of none."

Mr. Munger, a witness also produced by the importers, stated that he had never come in contact with clays used or suitable for use in the manufacture of crucibles and glass melting pots or tank blocks that had any bluer tinge than the samples exhibited, 1 and 2.

The examiner of merchandise at Philadelphia produced a sample of clay which was marked as "Illustrative Exhibit A," and stated that it was known to him as common blue clay, invoiced as such, and known to him as such, and passed as common blue clay suitable for the manufacture of crucibles. The witness Munger, comparing this clay with the samples introduced by the importers, testified that it was not bluer than any of these samples.

It would seem, therefore, that so far as actual color is concerned this clay answers the dictionary definition and corresponds to that which the Government by its officers has treated as answering to the term "blue clay." It also appears, as already pointed out, that it is clay suitable for use in the manufacture of glass pots.

It also appears from the testimony in the case that the color has nothing whatever to do with the suitability of the clay for the manufacture of glass pots; that the ingredient which gives the clay its color is eliminated in heating it preparatory for use. It may be

asked, therefore, why this designation of blue clay? The only answer which has occurred to us is that it is to differentiate it from a kind of clay which the testimony shows would be unfit for use in the manufacture of crucibles or glass pots—that is, a reddish clay containing too much iron. This element would not be eliminated by heating and would be objectionable for the uses indicated by the statute.

If any particular intensity of blue was intended, the word "common" was most inappropriate, for certain it is that a deep-blue colored clay is very rare anywhere and in many localities would be considered unique. But, however important the color may be deemed, it is clear that the Congress provided for glass-pot clay, and that no construction is open which renders this provision inoperative if there is a clay answering in any sense to the term "blue clay," which is also glasspot clay. It would seem that the clay here in question, though of a grayish tinge, is known as blue clay, both to lexicographers and to Government officials, and that those familiar with the glass-pot industry know of no clay used in making glass pots of a bluer tinge.

If it be said that the use of the word "common" implies ubiquity, this possible construction is rebutted by the controlling provision, "suitable for use in making crucibles or glass melting pots."

Nor is the chemical composition important. If, in fact, it answers to the color of the common blue clay and is of a quality suitable for the use prescribed, its varying chemical content (varying doubtless in different samples) becomes immaterial.

A portion of the clay imported came packed in bags. The question is raised as to whether clay in such covering is included within the free-list provision of either of the two tariff acts under consideration. The board, relying upon a previous board decision construing a provision of the tariff act of 1897 providing for free entry of "common blue clay in casks, suitable for the manufacture of crucibles" as warranting the introduction of clay in bulk in any form, held that the style of the packing does not determine the dutiability of the commodity.

After the decision cited, Congress, by the act of 1909, changed the phraseology of this free-list provision to read as quoted above, so that provision was made in these two enactments of 1909 and 1913 for free entry of clay in two different forms. This makes manifest the fact that the attention of Congress was directed to the subject of the container when the act of 1909 was adopted, and Congress specifically restricted by the terms employed the free entry of clay to that imported in cases or casks.

There is no ambiguity in this language, and where there is no ambiguity the rule is well settled that the language of the statute must control the courts. We may be able to see little occasion for making a distinction in rate between clay imported in bags and clay

imported in casks, and yet we can conceive that there may have been in the mind of Congress some ground for such distinction. It suffices to say that the distinction was made and it does not lie within our power to set aside the plain terms of the statute. Authorities are hardly required, but a reference may be made to our own decisions in Breck & Son *v.* United States (2 Ct. Cust. Appls., 26; T. D. 31576), Maltus & Ware *v.* United States (6 Ct. Cust. Appls., 525; T. D. 36146), and United States *v.* Innis (7 Ct. Cust. Appls., 3; T. D. 36254), in which case it was said:

> The language of the statute being plain and unambiguous, we are not warranted in disregarding its terms or in entering the field of speculation with a view to ascer, taining an unexpressed intent or in ascribing to the language employed a meaning other than that which the plain terms import.

Citing Breck *v.* United States and Maltus & Ware, supra.

It results that the decision must be reversed, but that reliquidation is directed only as to importations in barrels or casks.

*Reversed.*

### DISSENTING OPINION.

SMITH, Judge: I am sorry that I can not concur in the prevailing opinion.

At the hearing before the Board of General Appraisers the protestants submitted for the consideration of the board three groups of samples representative of the clays imported. The first group was made up of four exhibits, three of which represented raw clays of a dark-gray color and one of which was a raw clay which had been burned and was almost a creamy white.

The second group contained 14 exhibits of a raw clay ranging in color from a dark gray to a gray that was almost white.

The third group was composed of 13 exhibits, which were almost white in color and which represented clays which had been burned.

The samples of raw clay not only varied in color, but, according to the testimony, differed somewhat in properties.

C. H. Kerr, director of the research laboratory of the Pittsburgh Plate Glass Co., testified for the importers that all of the clays represented by the several exhibits were fire clays produced in the Province of Namur, Belgium, and that they possessed all the chemical and geological characteristics of Gross-Almerode clay, a clay deriving its name from a town in Germany near which the clay was mined. *He said that the term "blue" had no significance whatever in the trade and that therefore he could not describe Gross-Almerode clay as a common blue clay.*

He said the clays in controversy were glass-pot clays and that he knew of no clays suitable for the making of crucibles or glass melting pots or tank blocks which had a more bluish tinge than the samples which he had produced.

The witness stated that the glass-pot clay most widely known in the United States was the St. Louis clay, which had a typical gray and not a blue color, and that other clays of this country used to a less extent than the St. Louis clay for glass-pot purposes were all substantially without the bluish color.

He ascribed the blue in clays to the carbonaceous matter contained therein and said that the color had no practical bearing on the use of such clays, inasmuch as it disappears when submitted to a temperature far below that to which crucibles and glass pots are exposed.

He declared that you could not tell a clay by its appearance. He said clays alike in appearance might in fact be very dissimilar in properties and that clays approximately of the same composition might appear to be very dissimilar.

In his opinion any clay was suitable for making glass pots which would neither fuse at a temperature below 2600° F. nor crack when exposed to great heat and which, made into a pot, would not, on account of iron, magnesia, or alkali contained in it, discolor the melted glass or yield to the dissolving action of that class of molten material.

He said there were many clays which did not meet those requirements, although clays which might be suitable were widely distributed, geologically speaking.

The witness stated that he would find it extremely difficult to distinguish between Gross-Almerode clay and the imported clays under consideration, inasmuch as the Gross-Almerode deposit contained clays of the same range, type, and appearance as those mined in the vicinity of Namur, Belgium. So far as suitability for the making of glass pots was concerned, he said he could not distinguish one clay from the other.

H. M. Hoffman, purchasing agent for the Pittsburgh Plate Glass Co., and a witness for the protestants, testified that the samples submitted to the board were common pot clay and *that in a commercial sense there was no such term as "common blue clay."*

He asserted that no clays in use for the making of crucibles and glass melting pots had any bluer tinge than the samples.

H. B. Staley, Government examiner of merchandise at Philadelphia, testified for the importers that a clay, not an official sample, submitted to him was a common blue clay and was classified as such under the tariff acts of 1909 and 1913. The clay to which he referred was marked as "Illustrative Exhibit A" for identification, but was not introduced in evidence, and apparently can not now be found.

Henry A. Munger, importer of clays, testified, among other things, that there were certain clays in his business which were recognized as common blue clays. Under objection that the proper foundation

had not been laid, he stated that Exhibits 1 and 2 were common blue clays. Subsequently he said that none of the clays were bluish and that he had never seen any clays which he thought were blue. He asserted that "blue" was "a trade designation, a general generic term in contradistinction to clays generally less valuable, of a white or pale-yellow color." Later on the witness declared that the term "common blue clay" was not used in the trade. When asked what must be present in order that a clay might be classified as a blue clay, he replied that "it has those qualities which enables it to be used to advantage in the making of crucibles and glass pots and similar purposes, and what they are can be determined only by actual use." He afterwards amplified that answer by saying that he "could make an answer that would be right most of the time as to whether there were blue clays by a physical inspection, but it would have to be further substantiated by actual tests." He thought that Exhibits 1 and 2 were common blue clay, but he could not be sure without confirming his judgment by laboratory or practical tests. He said that some common blue clays could be identified by making them into crucibles or glass pots, and that the color of a common blue clay was anything from a light drab to a black or very dark brown.

That testimony establishes definitely and positively that there is such a thing as common blue clay, and that such a clay is imported and so classified by customhouses. There is no evidence in the record that the importation is "common blue clay." Its claim to that designation begins and ends with the assertion that it has "a bluish tinge," coupled with the statement of one of the witnesses that they know of no clay suitable for the making of glass pots which has "any more bluish tinge." The goods themselves appear to be gray, not blue, and that they are gray, not blue, seems to be borne out by the testimony which ascribes the "bluish tinge" to the presence of carbonaceous matter, pigmentation by which is usually black, not blue, and black mixed with white, the color to which the clay burns, produces gray. One of the importers' witnesses did testify that in color and the greasy, plastic appearance of their surface, some of the clays under consideration resembled the common blue clay passed by the customhouse under the tariff acts of 1909 and 1913. That similarity, however, can not be accepted as proving that the importation is common blue clay, first, because a greasy, plastic surface was not shown to be peculiar to common blue clay, and, second, because the evidence positively establishes that color is of no value whatever in determining the identity or nature of clays.

What are the components and characteristics of common blue clay and whether there are glass-pot blue clays which are not common blue clays, can scarcely be said to be within the judicial knowl-

edge, and consequently in the absence of evidence to that effect we can not say that all glass-pot blue clays, if any such there be, are common blue clays. Indeed, if we hold that the importation is a common blue clay, because the witnesses say that it is blue and is used for making glass pots, then we must hold that Gross-Almerode lay is also a common blue clay, inasmuch as the testimony definitely shows that Gross-Almerode clay, so much resembles in composition and appearance the clays here involved that looking at them one could not be distinguished from the other. That holding, however, can not well be made, not only because one of the witnesses testified that he could not describe Gross-Almerode clay as common blue clay, but because Congress itself saw fit to separately provide for common blue clay and for Gross-Almerode clay and presumably therefore Congress regarded them as different, not the same kinds of clay. And if Gross-Almerode clay is not common blue clay neither is the importation, since it is shown to be of the same color, composition, and appearance as Gross-Almerode clay and practically the very same clay.

Moreover, the clays in question are, according to the evidence, suitable for the manufacture of glass pots and the history of the legislation, we think, fully justifies grave doubt as to whether the common blue clays which Congress had in mind were fit for that use. The tariff acts of 1890, 1894, and 1897 contained a free-list provision for "common blue clays in casks suitable for the manufacture of crucibles." That provision was amended by paragraph 534 of the act of 1909, so as to read "common blue clay and Gross-Almerode clay in cases or casks suitable for the manufacture of crucibles and glass melting pots or tank blocks" and the amendment thus accomplished was proposed for the express purpose of putting clay for the manufacture of glass on the same footing with that used in crucibles for the manufacture of iron and steel. (Cong. Rec., 61st Cong., 1st sess., July 5 to July 16, 1909, p. 4396.)

Considering that common blue clay suitable for the manufacture of crucibles had been on the free list for 19 years prior to the amendment and that Congress must have known the use to which such a clay was devoted, it can hardly be assumed that the amendment would have been allowed to pass unquestioned if common blue clay was suitable for the manufacture of tank blocks or that kind of crucible which is known as a glass pot.

But however that may be, the record shows that a sample of clay submitted to H. B. Staley, a customs examiner of merchandise and a witness for the importers, was identified by him as common blue clay. Compared analyses of that sample and of the official samples would have definitely determined whether the importation was or was not a common blue clay.

The importers failed to introduce the illustrative exhibit and failed to submit any analysis of common blue clay or of the commodity imported. With the proven fact before them that blue clays might be radically different and no proof whatever that blue clays fit for glass pots were common blue clays they chose to rest their case on the statement that the merchandise in question was of a bluish color and suitable for making glass pots, a statement contradicted as to color by at least one of the witnesses, by the goods themselves, and apparently by the color of the matter to which the "bluish tinge" is attributed.

The Pittsburgh Plate Glass Co., for which this importation was made, has ample facilities for determining the nature and composition of the materials which it uses and if we do not indulge in the presumption that material evidence which might have been and was not produced by them, was adverse, we must at least decline to accept as proof of their contentions weak and inclusive evidence when stronger and more satisfactory evidence was available.

I therefore conclude that it has not been shown that the clays in controversy are common blue clays. The substance in issue is not from Gross-Almerode, Germany, but from Namur, Belgium, and is therefore not Gross-Almerode clay, although evidently of that type.

Congress having elected to free list common blue clay and Gross-Almerode clay and no other clays suitable for the manufacture of crucibles and glass pots or tank blocks and the evidence being insufficient to show that the materials imported are in fact common blue clay or Gross-Almerode clay, or known to the trade as such, I am of the opinion that the merchandise was properly assessed and that the decision of the Board of General Appraisers should be affirmed, not reversed.

### DISSENTING OPINION.

BARBER, Judge, concurring with SMITH, Judge: "Clay" is defined in the Standard Dictionary as "a common earth of various colors, compact and brittle when dry, but plastic and tenacious when wet," and I think this accords with common understanding as to the meaning of the word.

Congress recognizes there is a blue clay, which accords with common knowledge. It has provided that such clay when suitable for certain uses shall be given free entry. Color is ascertained by ocular inspection, and to say that whether or not a clay is blue depends upon a laboratory test to determine the existence of other qualities, or upon the uses to which it may be applied, seems to me to disregard the plain meaning of language and to eliminate from the statute words which the legislators deliberately placed therein. Upon the record before us I think the judgment below should be affirmed.